**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CARLOS MARTINEZ,                    ) Case No. EDCV 15-1563-JPR
                                    )
              Plaintiff,            )
                                    ) **MEMORANDUM DECISION AND ORDER**
         v.                         ) **AFFIRMING COMMISSIONER**
                                    )
NANCY A. BERRYHILL, Acting          )
Commissioner of Social              )
Security,                           )
                                    )
              Defendant.            )
————————————————————               )

**I.    PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for supplemental security income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).  The matter is before the Court on the parties' Joint Stipulation, filed October 3, 2016, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed.

## II.   BACKGROUND

Plaintiff was born in 1969.  (Administrative Record ("AR") 53.)  He completed ninth grade (AR 54) and worked as a machine packer and in a hybrid job of part-time security guard, part-time commercial cleaner (AR 70-71).

On January 16, 1991, Plaintiff filed an application for SSI, alleging that he had been unable to work since October 6, 1988. (AR 77.)  The claim was denied and Plaintiff did not appeal. (Id.)  On September 10, 2004, Plaintiff filed another application for SSI, alleging that he had been unable to work since August 15, 2004, because of fibromyalgia.  (Id.)  The ALJ found that Plaintiff was disabled and awarded him a closed period of disability benefits from May 20, 2004, to November 6, 2005.  (AR 77, 84.)  Plaintiff filed a third application for SSI together with an application for Social Security disability insurance benefits ("DIB") on June 4, 2009, alleging that he had been unable to work since December 24, 2008.  (AR 88.)  On December 23, 2010, the ALJ issued an unfavorable decision, finding that although Plaintiff had severe impairments of disc desiccation and protrusion, degenerative joint disease, "status post blunt trauma puncture wound" of the right lower extremity, gastroesophageal reflux disease, and depression, he was not disabled from December 24, 2008, through the date of the decision because he was able to perform jobs available in the national economy.  (AR 85-97.) Plaintiff requested review from the Appeals Council; on October 13, 2011, the Appeals Council denied review.  (AR 103.)  This Court affirmed the Commissioner's denial of SSI and DIB on December 7, 2012.  See Martinez v. Astrue, No. CV 11-10082-JPR,

2012 WL 6093509 (C.D. Cal. Dec. 7, 2012). Plaintiff did not appeal to the Ninth Circuit.

On February 12, 2013, Plaintiff filed an application for SSI, and on February 27 he filed one for DIB, alleging in both that he had been unable to work since December 24, 2008, because of fibromyalgia, back pain, severe disc dessication and protrusion, arthritis, degenerative joint disease, gastroesophageal reflux disease, depression, chronic fatigue, muscle weakness and "pain all over the body," frequent severe headaches, and problems sleeping. (AR 108-09, 123-24, 323.) After his applications were denied initially (AR 188, 193) and on reconsideration (AR 141, 157; see also AR 172), Plaintiff requested a hearing before an Administrative Law Judge but was apparently allowed to proceed only on his SSI claim (see AR 221-22 (denial of hearing, noting that administrative res judicata barred review of Plaintiff's "Social Security Disability application"), 224-25 (Nov. 25, 2013 letter granting hearing)). A hearing was held on July 11, 2014, at which Plaintiff, who was represented by counsel, testified through an interpreter; a vocational expert also testified. (AR 49.) In a written decision issued August 12, 2014, the ALJ found Plaintiff not disabled.[1] (AR 24-41.) Plaintiff requested review from the

---

[1] Although a Chavez Rationale worksheet compared records from Plaintiff's previous applications against his existing case file and found "No Material Change per Chavez AR" (AR 140 (citing SSA Acquiescence Ruling 97-4(9), 1997 WL 742758 (Dec. 3, 1997)), the ALJ did not apply res judicata to Plaintiff's claim (AR 30-31). "The principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988). "Normally, an ALJ's

3

Appeals Council (AR 393); on November 21, 2014, it denied review (AR 13).  This action followed.

### III. STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole.  See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not

---

findings that a claimant is not disabled creates [sic] a presumption that the claimant continued to be able to work after that date."  Vasquez v. Astrue, 572 F.3d 586, 597 (9th Cir. 2009).  "The presumption does not apply, however, if there are 'changed circumstances.'"  Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995) (as amended) (quoting Taylor v. Heckler, 765 F.2d 872, 875 (9th Cir. 1985)).  The ALJ discussed Plaintiff's December 23, 2010 SSI denial and determined that the "rebuttable presumption of continuing nondisability" had been rebutted because Plaintiff had shown "changed circumstance[s] material to the determination of disability."  (AR 30.)

substitute its judgment" for the Commissioner's.  Id. at 720-21.

**IV.  THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.  The Five-Step Evaluation Process

The ALJ follows a five-step sequential evaluation process to assess whether a claimant is disabled.  20 C.F.R. § 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.  § 416.920(a)(4)(I).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and his claim must be denied.  § 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404, subpart P, appendix

1; if so, disability is conclusively presumed.
§ 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[2] to perform his past work; if so, he is not disabled and the claim must be denied.  § 416.920(a)(4)(iv).  The claimant has the burden of proving he is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the national economy. § 416.920(a)(4)(v); Drouin, 966 F.2d at 1257.  That determination comprises the fifth and final step in the sequential analysis. § 416.920(a)(4)(v); Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.    The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had engaged in substantial gainful activity during the relevant period.  (AR 33.)  Specifically, the ALJ found that Plaintiff engaged in substantial gainful activity in the "fourth quarter of 2013"

---

[2] RFC is what a claimant can do despite existing exertional and nonexertional limitations.  § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

through the date of the decision, August 12, 2014.[3]  (AR 33.)
Because Plaintiff had not been engaged in substantial gainful
activity "from the application date" – February 12, 2013 –
"through the third quarter of 2013," the ALJ nonetheless moved on
to the other steps of the analysis to "consider the period during
which [Plaintiff] did not perform substantial gainful activity."
(Id.)  At step two, the ALJ concluded that Plaintiff had severe
impairments of degenerative joint disease of the lumbar spine as
well as adjustment disorder with mixed anxiety and depressed
mood.  (Id.)  At step three, the ALJ determined that Plaintiff's
impairments did not meet or equal a listing.  (AR 34.)

At step four, the ALJ found that Plaintiff had the RFC to
perform light work[4] with the following limitations:

> [He] can lift and/or carry 20 pounds occasionally and 10
> pounds frequently.  He can stand and/or walk for six
> hours out of an eight-hour workday with regular breaks.
> He can sit for six hours out of an eight-hour workday
> with regular breaks.  He can occasionally climb ramps and

---

[3] At the hearing – on July 11, 2014 – Plaintiff testified
that he was currently working eight hours a day at a lumber
company in a hybrid job of part-time security guard, part-time
commercial cleaner.  (AR 56.)  He had been working there for
"[a]bout eight months."  (Id.)

[4] "Light work involves lifting no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to
10 pounds." § 416.967(b). "Even though the weight lifted may be
very little, a job is in this category when it requires a good
deal of walking or standing, or when it involves sitting most of
the time with some pushing and pulling of arm or leg controls."
Id.  If someone can do light work, then "he . . . can also do
sedentary work, unless there are additional limiting factors such
as loss of fine dexterity or inability to sit for long periods of
time."  Id.

stairs, balance, stoop, kneel, crouch, and crawl.  He
cannot climb ladders, ropes, or scaffolds.  He is
precluded from work around unprotected heights, around
moving machinery, or other hazards.  He is able to
perform simple to moderately complex work.

(AR 35.)  Based on the VE's testimony, the ALJ concluded that
Plaintiff could not perform his past relevant work as a machine
packer, security guard, or commercial cleaner.[5]  (AR 39-40.)  At
step five, the ALJ relied on the VE's testimony to find that
given Plaintiff's RFC for light work "impeded by additional
limitations," he could perform three light, unskilled
"representative occupations" in the national economy: (1)
"housekeeping cleaner," DOT 323.687-014, 1991 WL 672783; (2)
"cafeteria attendant," DOT 311.677-014, 1991 WL 672695; and (3)
"dry cleaner," DOT 589.685-038, 1991 WL 684490.  (AR 40-41, 72.)
The ALJ determined that the VE's testimony was consistent with
the DOT.  (AR 41.)  Accordingly, the ALJ found Plaintiff not
disabled.  (Id.)

**V.   DISCUSSION**

Plaintiff argues that the ALJ erred in (1) assessing the
medical evidence, (2) assessing his credibility, (3) determining
his RFC, and (4) finding that he could perform light-exertion
jobs.[6]  (See J. Stip. at 8, 17.)

---

[5] Although Plaintiff was then performing a hybrid
combination of the last two jobs, the ALJ found that he could not
perform either one separately.  (AR 40.)

[6] In issue one, "[w]hether the ALJ properly considered
[Plaintiff]'s symptoms and limitations" (J. Stip. at 8),
Plaintiff raises two separate arguments: the ALJ erred in "not
properly considering and discussing" his preapplication medical

A.   <u>The ALJ Properly Assessed the Medical Evidence</u>

Plaintiff contends that the ALJ erred in "not properly considering and discussing" the medical evidence from before February 12, 2013, the date of his application.  (<u>Id.</u> at 9.)  For the reasons discussed below, remand is not warranted on this ground.

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff, (2) those who examined but did not treat the plaintiff, and (3) those who did neither.  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than an examining physician's, and an examining physician's opinion is generally entitled to more weight than a nonexamining physician's.  <u>Id.</u>

This is so because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant. <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  § 416.927(c)(2). If a treating physician's opinion is not given controlling weight, its weight is determined by length of the treatment relationship, frequency of examination, nature and extent of the treatment relationship, amount of evidence supporting the opinion, consistency with the record as a whole, the doctor's

_____

evidence (<u>id.</u> at 9) and in evaluating his credibility (<u>id.</u> at 17).  The Court discusses those issues separately.

area of specialization, and other factors.   § 416.927(c)(2)-(6).

When a treating physician's opinion is not contradicted by other evidence in the record, it may be rejected only for "clear and convincing" reasons.  See Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008) (citing Lester, 81 F.3d at 830-31).  When it is contradicted, the ALJ must provide only "specific and legitimate reasons" for discounting it.  Id. (citing Lester, 81 F.3d at 830-31).  Furthermore, "[t]he ALJ need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004).

An ALJ need not recite "magic words" to reject a treating physician's opinion; the court may draw "specific and legitimate inferences" from the ALJ's opinion.  Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989).  "[I]n interpreting the evidence and developing the record, the ALJ does not need to 'discuss every piece of evidence.'"  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (quoting Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998)).  An ALJ need not address medical records from before the relevant period.  See Vincent ex rel. Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam) (ALJ properly ignored opinion of psychiatrist who examined Plaintiff only before relevant period because evidence "was neither significant nor probative"); March v. Comm'r of Soc. Sec. Admin., 462 F. App'x 671, 673 (9th Cir. 2011) (ALJ "adequately considered [claimant's] medical records and treatment

notes, reasonably found old reports to be of little value as they did not bear on [claimant's] disability during the relevant period, and reasonably omitted any discussion of treating notes that did not materially corroborate [claimant's] claims"). Indeed, although the ALJ is required to develop a claimant's "complete medical history," that is limited to "at least the 12 months preceding the month" in which the SSI application was filed.  See § 416.912(d).

## 2.   Relevant background

In August 2012, Plaintiff was evaluated by Christina Barrager, a physician's assistant at the Community Health Alliance of Pasadena ("CHAP").  (AR 674-82.)  Barrager diagnosed low-back pain, fibromyalgia, and depression (AR 677), noted that Plaintiff could lift only 10 pounds (AR 680), and found him "[t]emporary [sic] unemployable" until March 2013 (AR 682).  On February 22, 2013, Plaintiff was assessed for low-back pain at CHAP by Xochiti Flores, a physician's assistant, who diagnosed chronic low-back pain and "myalgia and myositis, unspecified," and refilled his prescriptions of ibuprofen and amitriptyline.[7] (AR 692-95.)  A February 28, 2013, lumbar-spine x-ray indicated mild facet arthropathy in Plaintiff's lower lumbar spine but revealed no other significant findings.  (AR 708.)  Flores confirmed her diagnoses of chronic low-back pain and myalgia on April 3, 2013.  (AR 683-84.)

---

[7] Myalgia is muscular pain, and myositis is muscle inflammation.  Stedman's Medical Dictionary 1167, 1176 (27th ed. 2000).  Amitriptyline is used to treat symptoms of depression. See Amitriptyline, MedlinePlus, https://medlineplus.gov/druginfo/meds/a682388.html (last updated Aug. 1, 2010).

On June 10, 2013, Plaintiff was evaluated and treated at CHAP by Dr. Paul N. Gailiunas. (AR 738-40.) Dr. Gailiunas diagnosed myalgia and myositis, chronic low-back pain, and depression and prescribed amitriptyline, ibuprofen, and tramadol.[8] (AR 738-39.) He noted under "Subjective" that Plaintiff had fibromyalgia, presumably because Plaintiff told him that. (AR 739.) On July 10, 2013, Plaintiff complained of stomach problems; physician's assistant Flores diagnosed irritable bowel syndrome. (AR 730-31.) On August 7, 2013, Plaintiff was evaluated and treated at CHAP by Dr. David Coutin, who confirmed Plaintiff's diagnoses of chronic low-back pain, depression, myalgia and myositis, and irritable bowel syndrome. (AR 722-23.) He also added diagnoses of constipation and high triglycerides. (Id.) Dr. Coutin did not diagnose fibromyalgia, although he recognized the prior diagnosis of myalgia. (AR 722.) On December 12, 2013, Plaintiff was evaluated by Dr. Samuel Pierce for medication refills; Dr. Pierce prescribed amitryptyline, ibuprofen, and tramadol for Plaintiff's myalgia and myositis and chronic low-back pain. (AR 778-79.)

On July 1 and 2, 2013, state-agency medical consultants Drs. D. Chan and M.D. Morgan[9] completed a disability determination for Plaintiff's SSI and DIB claims. (AR 108-22 (SSI), 123-37 (DIB).)

---

[8] Tramadol is pain medication. See Tramadol, MedlinePlus, https://medlineplus.gov/druginfo/meds/a695011.html (last updated Jan. 15, 2017).

[9] Dr. Chan's signature line includes a medical-consultant code of "19," indicating "[i]nternal [m]edicine" (AR 138); see Program Operations Manual System (POMS) DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004. Dr. Morgan's specialty is not clear from the record.

They reviewed Plaintiff's pre-application-date medical evidence and his recent medical records but did not examine him.  (AR 110-14.)  They found that Plaintiff had a severe discogenic and degenerative back disorder and an affective disorder.  (AR 116-17.)  Dr. Morgan found no restrictions in Plaintiff's activities of daily living or maintaining social functioning.  (AR 117.)  Although Plaintiff had mild difficulty maintaining concentration, persistence, or pace and had moderate limitations in his ability to understand, remember, and carry out detailed instructions, he had no other significant limitations in the areas of memory and understanding.  (AR 119-20.)  Dr. Chan assessed Plaintiff's RFC, finding that he could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours in an eight-hour workday; sit, with normal breaks, for about six hours in an eight-hour workday; and push and/or pull and operate hand and foot controls without limitation.  (AR 118.)  Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  (AR 119.)

On August 20 and 28, 2013, state-agency medical consultants Drs. Thu N. Do and Aroon Suansilppongse[10] completed a case analysis.  (AR 141-71.)  Dr. Do considered medical evidence from before Plaintiff's application date and his recent medical records.  (AR 143.)  Dr. Do agreed with the initial analysis of state-agency consultants Drs. Chan and Morgan.  (AR 150.)  Dr.

---

[10] Dr. Do's signature line includes a medical-consultant code of "12," indicating "[f]amily or [g]eneral [p]ractice" (AR 187); see POMS DI 24501.004, U.S. Soc. Sec. Admin. (May 5, 2015), https://secure.ssa.gov/poms.nsf/lnx/0424501004.  Dr. Suansilppongse's specialty is not clear from the record.

Suansilppongse completed a psychiatric review of Plaintiff's medical records dating back to June 4, 2009, and found that Plaintiff had mild restrictions in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace. (AR 150-51.) Dr. Suansilppongse noted that "[t]he bulk of the medical evidence . . . is related to physical impairments and treatment," and Plaintiff's "mental condition is self-limiting or improved with appropriate treatment." (AR 151.)

Plaintiff was under the care of Dr. William Montgomery from September 2013 to July 2014. (See AR 837-38.) On September 27, 2013, Plaintiff was apparently involved in an accident at work and complained of left-shoulder pain; Dr. Montgomery diagnosed shoulder contusion and left-shoulder tendinitis. (AR 843.) On October 4, 2013, Plaintiff returned to Dr. Montgomery with left-shoulder pain but reported improvement on October 11 after taking Motrin. (AR 842.) Plaintiff's shoulder pain returned, and on January 27, 2014, a physician's assistant diagnosed rotator-cuff sprain and prescribed ibuprofen. (Id.) He noted that Plaintiff took amitriptyline for insomnia. (AR 841.) Dr. Montgomery examined and treated Plaintiff the next day, on January 28, 2014. (Id.) X-rays of Plaintiff's shoulder were normal; Dr. Montgomery diagnosed left-shoulder tendinitis and restricted Plaintiff to lifting no more than 15 pounds at work, with limited overhead reaching. (Id.) Plaintiff attended physical therapy for his shoulder in February and March 2014 (see AR 853-64) and reported some improvement in his left-shoulder pain; Dr. Montgomery recommended continued modified work, occupational therapy,

1  Motrin, and topical pain medication (AR 839-40).

2      An MRI of Plaintiff's left shoulder on April 4, 2014,
3  indicated "mild-moderate acromioclavicular joint arthrosis" and
4  "mild supraspinatus tendinosis." (AR 886-87.)  On April 15,
5  2014, Dr. Montgomery gave Plaintiff an "intra-articular"
6  injection in his left shoulder to reduce the pain and
7  inflammation. (AR 838-39.)  His pain returned on May 2, 2014;
8  Dr. Montgomery referred him to an orthopedic specialist. (AR
9  838.)  Dr. Montgomery did not mention or diagnose fibromyalgia,
10 headaches, or stomach problems.

11     On February 19, 2014, Plaintiff was evaluated by Gessica A.
12 Saunders, a nurse practitioner; she diagnosed depression,
13 fibromyalgia, and tinea manuum,[11] noted that Plaintiff's
14 depression and fibromyalgia were stable, and prescribed tramadol,
15 ibuprofen, and amitriptyline. (AR 896-97.)  Plaintiff returned
16 to the same office on March 10, 2014, complaining of a cough and
17 sore throat, and was evaluated and treated by Dr. Robert A.
18 Loera. (AR 900.)  Dr. Loera prescribed medication for the cough,
19 noted Plaintiff's earlier diagnoses, and authorized refills for
20 his other prescriptions. (AR 901-02.)  On May 29, 2014, at the
21 same office, Plaintiff was evaluated and treated by physician's
22 assistant Jacqueline Bowier. (AR 905.)  His chief complaint was
23 nail fungus, but he also complained of shoulder pain and wanted
24 refills of his medication for his fibromyalgia, which he noted
25 was "doing better." (AR 905-08.)  On July 10, 2014, Plaintiff

26 ────────────

27     [11] Tinea is the name of a group of diseases caused by a
   fungus. See Tinea Infections, MedlinePlus, https://
28 medlineplus.gov/tineainfections.html (last updated Jan. 24,
   2017).

was evaluated and treated by Dr. Kim Hoang, who noted Plaintiff's history of fibromyalgia and prescribed refills of his medications. (AR 911-12.)

### 3. Analysis

Plaintiff argues that the ALJ erred in not discussing or considering the pre-application-date medical evidence. (See J. Stip. at 9.) The ALJ "considered the complete medical history" (AR 31) but did not discuss "in detail" the medical-opinion evidence from before the date of application (AR 37).[12] The ALJ found that such evidence had "limited relevance" to whether Plaintiff was disabled "for the period at issue" – on or after February 12, 2013. (Id.)

Plaintiff argues that the ALJ erred in "not properly considering and discussing" the medical opinions of Dr. Philip A. Sobol, an orthopedic surgeon who evaluated and treated him from 2004 to 2010 as part of a workers'-compensation case (see AR 483);[13] Dr. Thomas A. Curtis, a psychiatrist who evaluated and

---

[12] The ALJ assessed whether Plaintiff had been under a disability on or after his application date rather than his alleged onset date (see AR 31, 41), noting that the earliest month Plaintiff could receive SSI benefits was the month following the month in which he filed his application (AR 31 (citing § 416.335)). Plaintiff has not challenged that portion of the ALJ's decision.

[13] On June 24, 2009, in finding Plaintiff "temporarily totally disabled" for workers'-compensation purposes, Dr. Sobol diagnosed lumbosacral musculoligamentous sprain or strain with bilateral lower-extremity radiculitis, "right side worse than left," and noted Plaintiff's complaints of depression, anxiety, stress, and gastrointestinal upset but deferred those complaints to an "appropriate specialist." (AR 498-500.) On December 21, 2009, noting the results of a recent MRI, Dr. Sobol added to Plaintiff's diagnoses disc desiccation and protrusion at L4-5 and L5-S1, moderately significant central canal stenosis at L4-5, and facet degenerative joint disease at L5-S1 "greater than L4-5."

treated him from July 2009 to May 2010 (see AR 418-80);[14] and Dr.
Gerald Y. Ho, who evaluated and treated Plaintiff from December
2010 to August 2011 (see AR 554-74).[15]  Plaintiff also contends
that the ALJ erred in finding nonsevere his impairments of
headaches, gastroesophageal reflux disease, and left-shoulder
pain and in rejecting his alleged impairments of fibromyalgia and
radiculopathy.  (See J. Stip. at 9, 10-11, 13, 16.)

(AR 517.)  Dr. Sobol noted that Plaintiff had received
"conservative" treatment (id.) and deferred "further treatment of
an invasive nature" (AR 518).  He recommended that Plaintiff be
"precluded from activities requiring heavy lifting, repetitive
bending and stooping," and "very prolonged weight-bearing."  (AR
524.)  He "should be off his feet for one hour out of an eight-
hour workday."  (Id.)

[14] Dr. Curtis evaluated and treated Plaintiff for his
worker's-compensation case.  Dr. Curtis completed a psychological
evaluation on October 30, 2009, finding that Plaintiff had
moderate impairments in his activities of daily living; social
functioning; concentration, persistence, and pace; and
adaptation.  (AR 450.)  He recommended a course of psychotherapy,
"stress-reduction biofeedback," and psychotropic medication.  (AR
454-55.)  In a progress note from May 19, 2010, Dr. Curtis
recommended a "[r]outine refill" of Plaintiff's medications and
noted "visible anxiety," "depressed expressions," and no side
effects from medication.  (AR 462.)

[15] On December 15, 2010, Dr. Ho diagnosed fibromyalgia,
fatigue, and depression; he recommended ibuprofen for Plaintiff's
pain, physical therapy and Cymbalta for his fibromyalgia,
amitriptyline "for sleep – not for pain," and Motrin and pain
injections for his shoulder.  (AR 557-58.)  He noted pain in 12
of 18 "trigger points," which are "pain points or localized areas
of tenderness around joints . . . that hurt when pressed with a
finger," see Fibromyalgia Tender Points, WebMD, http://
www.webmd.com/fibromyalgia/guide/fibromyalgia-tender-points#2
(last updated May 10, 2016), sometimes used to diagnose
fibromyalgia.  (AR 557.)  During a follow-up visit on February
16, 2011, Dr. Ho noted 14 of 18 trigger points.  (AR 561.)  On
April 14, 2011, Plaintiff was examined by Freddy Chan, a
physician's assistant supervised by Dr. Ho.  (AR 563-68.)  Chan
noted 16 of 18 trigger points.  (AR 565-67.)  Chan examined
Plaintiff again on August 22, 2011, noting 16 of 18 trigger
points.  (AR 569-72.)

As an initial matter, the ALJ was not required to discuss the medical evidence from before the application date, including the opinions of Drs. Sobol, Curtis, and Ho, because it was "neither significant nor probative" to the question of whether Plaintiff was disabled on or after February 12, 2013.  See Heckler, 739 F.2d at 1394-95; March, 462 F. App'x at 673.  To the extent the medical-opinion evidence after February 12, 2013, discussed Plaintiff's alleged impairments of headaches, gastroesophageal reflux disease, left-shoulder pain, fibromyalgia, and radiculopathy, because those opinions were contradicted by other medical opinions in the record, the ALJ had to give only specific and legitimate reasons for discounting all or part of them.  See Carmickle, 533 F.3d at 1164.[16]  As discussed below, the ALJ did so.

The ALJ gave "great weight" to the opinions of state-agency consultants Drs. Chan, Morgan, and Do.  (AR 38-39.)  Drs. Chan and Morgan found that Plaintiff had a severe back disorder and depression but no limitations in his activities of daily living

_____

[16] It is not apparent that the medical opinions of Drs. Sobol and Curtis were entirely rejected by the ALJ.  Other than his diagnosis of radiculitis, Dr. Sobol's opinions appear consistent with Plaintiff's RFC.  Dr. Sobol found that Plaintiff could work but with restrictions on heavy lifting, repetitive bending and stooping, and "very prolonged weight-bearing."  (AR 518.)  He "should be off his feet for one hour" a day.  (Id.)  This is consistent with Plaintiff's RFC to perform light work with additional limitations of occasional posturals and standing for six hours in an eight-hour workday.  (AR 35.)  Dr. Curtis assessed moderate impairments in Plaintiff's mental functioning, but the ALJ did not reject a finding that Plaintiff had a mental impairment.  In fact, the ALJ gave Plaintiff "the benefit of the doubt" in finding that he had a severe mental impairment (AR 39) and limiting him to "simple to moderately complex work" (AR 35).

or maintaining social functioning (AR 117); Dr. Chan found that
he could lift and/or carry up to 20 pounds occasionally and 10
pounds frequently, stand and/or walk about six hours in an eight-
hour day and sit, with normal breaks, for the same amount of time
(AR 119); Dr. Do agreed with Drs. Chan and Morgan (AR 150).  In
forming their opinions, Drs. Chan and Morgan reviewed the pre-
application-date medical evidence from Dr. Curtis (see AR 113),
and Dr. Do reviewed the pre-application-date medical records from
CHAP, Drs. Sobol and Ho, and physician's assistant Chan (see AR
159).

     Although Dr. Sobol diagnosed "bilateral lower-extremity
radiculitis" in Plaintiff's spine in 2009 (AR 498-500), as the
ALJ pointed out, there was no recent medical evidence of that
condition (AR 34).  Indeed, a February 28, 2013, lumbar-spine x-
ray indicated mild facet arthropathy in the lower lumbar spine
but no other significant findings.  (AR 708.)  Inconsistency with
the medical record and lack of diagnostic evidence are
permissible reasons for the ALJ to give medical opinions little
weight.  See Batson, 359 F.3d at 1195 (ALJ may discredit treating
physicians' opinions that are "unsupported by the record as a
whole"); Thomas, 278 F.3d at 957 (ALJ need not accept treating-
physician opinion that is "inadequately supported by clinical
findings"); cf. § 416.927(c)(3) ("The more a medical source
presents relevant evidence to support a medical opinion,
particularly medical signs and laboratory findings, the more
weight we will give that medical opinion.").

     As to Plaintiff's alleged left-shoulder impairment, Dr.
Montgomery opined that Plaintiff could lift no more than 15

pounds and had limited overhead reaching.  (AR 841.)  For
treatment, however, Dr. Montgomery recommended physical therapy,
which helped.  (AR 839-40.)  He opined that Plaintiff could
continue working.  (<u>Id.</u>)  An MRI revealed only "mild" shoulder
problems.  (AR 886-87.)  The ALJ gave "little weight" to the
opinion of Dr. Montgomery because it was "too restrictive" in
light of his own treatment records and was inconsistent with the
diagnostic imaging evidence.  (AR 38.)  As Plaintiff points out
(<u>see</u> J. Stip. at 15), a pain injection in his shoulder provided
complete, albeit temporary, relief in April 2014 (AR 838-39), but
other records showed no further need for pain injections or more
aggressive treatment (<u>see</u> AR 895-97 (Feb. 19, 2014, no complaints
of shoulder pain), 900-03 (March 10, 2014, same), 905-08 (May 29,
2014, complaints of shoulder pain that was "improved by heat and
ice," no aggressive treatment recommended)).  Conservative
treatment and lack of diagnostic evidence are permissible reasons
for an ALJ to discount a treating physician's opinion.  <u>See</u>
<u>Thomas</u>, 278 F.3d at 957; <u>Hanes v. Colvin</u>, 651 F. App'x 703, 705
(9th Cir. 2016) (finding that ALJ permissibly discounted treating
physicians' opinion in part because of conservative treatment);
<u>Walter v. Astrue</u>, No. EDCV 09-1569-AGR, 2011 WL 1326529, at *3
(C.D. Cal. Apr. 6, 2011) (medication, physical therapy, and
single injection amounted to "conservative treatment").  <u>But see</u>
<u>Yang v. Colvin</u>, No. CV 14-2138-PLA, 2015 WL 248056, at *6 (C.D.
Cal. Jan. 20, 2015) (fact that epidural injections had been
recommended by doctor, even when claimant did not actually
receive one, weighed against finding treatment conservative).
        In finding that the medical evidence did not support an

opinion that Plaintiff suffered from the medically determinable impairment of fibromyalgia, the ALJ applied Social Security Ruling 12-2p.  (AR 34); see SSR 12-2p, 2012 WL 3104869 (July 25, 2012).  The ALJ found "no evidence of at least 11 positive tender points bilaterally both above and below the waist" during the relevant period, and no evidence of "repeated manifestations of six or more fibromyalgia symptoms."  (AR 34); see also SSR 12-2p, 2012 WL 3104869, at *2-3.  Under SSR 12-2p, to show a medically determinable impairment of fibromyalgia, a claimant must provide evidence from an acceptable medical source – a licensed physician – that "document[s] that the physician reviewed the person's medical history and conducted a physical exam."  2012 WL 3104869, at *2.  The doctor's evidence must be based on a physical exam and must meet either the three "1990 ACR Criteria for the Classification of Fibromyalgia," which are "[a] history of widespread pain . . . that has persisted (or that persisted) for at least 3 months," "[a]t least 11 positive tender points . . . bilaterally . . . and both above and below the waist," and "[e]vidence that other disorders that could cause the symptoms or signs were excluded"; or the three "2010 ACR Preliminary Diagnostic Criteria," which are "[a] history of widespread pain," "[r]epeated manifestations or six or more [fibromyalgia] symptoms, signs, or co-occurring conditions," and "[e]vidence that other disorders that could cause these repeated manifestations . . . were excluded."  Id. at *2-3.

The ALJ was aware of Plaintiff's history of fibromyalgia and treatment for that condition.  (See AR 34.)  The ALJ found, however, that the diagnosis was not supported by recent medical

evidence.  (Id.); see Alexander v. Comm'r of Soc. Sec., 373 F.
App'x 741, 744 (9th Cir. 2010) (ALJ properly discredited
claimant's allegation of disabling fibromyalgia when physician
had diagnosed fibromyalgia seven years before alleged onset date
and claimant was able to work during that time).  In so finding,
the ALJ considered both sets of criteria from SSR 12-2p.  (AR
34.)

Indeed, no medical opinion during the relevant period
satisfies the requirements of SSR 12-2p: CHAP physician's
assistants Barrager[17] and Flores, who diagnosed Plaintiff with
fibromyalgia, were not acceptable medical sources (see AR 677-
84); Drs. Gailiunas and Pierce noted the prior diagnosis of
Barrager and Flores but did not make the diagnosis themselves or
substantiate it with the appropriate evidence (see AR 738-40,
778); Dr. Coutin mentioned the diagnosis of "myalgia" but did not

---

[17] The ALJ gave "little weight" to Barrager's opinion, which
diagnosed low-back pain, fibromyalgia, and depression (AR 677),
noted that Plaintiff could lift only 10 pounds (AR 680), and found
him "[t]emporar[ily] unemployable" until March 2013 (AR
682), because she was "not an acceptable medical source" and
because the opinion was "not consistent with the relevant
clinical and diagnostic findings in the record" and was based on
evidence "not within the period at issue" (AR 38).  Those are
permissible reasons to reject Barrager's opinion.  An opinion
from a nonacceptable medical source, including a physician's
assistant, may be rejected for "germane" reasons.  Molina v.
Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012); see also
§ 416.913(a) ("[a]cceptable medical sources" include only
licensed physicians, psychologists, optometrists, podiatrists,
and speech pathologists).  The ALJ properly rejected Barrager's
opinion as inconsistent with the record as a whole, see Bayliss
v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005)
("[i]nconsistency with medical evidence" is germane reason for
discounting lay opinion); § 416.927(c)(4) (more weight given "the
more consistent an opinion is with the record as a whole"), and
as based on preapplication evidence, see March, 462 F. App'x at
673.

order any labs, make any specific findings on physical exam, or rule out other sources of pain (see AR 722-23); Dr. Montgomery did not mention it (see AR 837-87); nurse practitioner Saunders diagnosed it in February 2014 but was not an acceptable medical source, and no diagnostic or physical-examination evidence supported her diagnosis (see AR 895-97 (no mention of fibromyalgia examination in "physical exam" section or discussion of symptoms)); there is no evidence that Dr. Loera, who saw Plaintiff for a cough in March 2014, completed any kind of physical exam at all (see AR 900-02); physician's assistant Bowier, even if her recognition that Plaintiff complained of fibromyalgia could be considered a diagnosis, is not an acceptable medical source (see AR 905-08); and there is no evidence that Dr. Hoang did anything more than simply note Plaintiff's medical history of the condition (see AR 911-12).[18]

Finding that Plaintiff's impairments of gastroesophageal reflux disease and headaches were nonsevere, the ALJ cited lack

---

[18] Further, although the ALJ was not required to and did not discuss "in detail" the preapplication medical evidence of Plaintiff's fibromyalgia (AR 37), it is clear from the other parts of his decision that the ALJ considered but rejected it because it was unsupported by the recent medical record and inconsistent with other medical opinions. A favorable ALJ opinion from 2006 found that Plaintiff had a medically determinable impairment of fibromyalgia (see AR 76-84), but an intervening unfavorable opinion in December 2010 did not (see AR 85-97). Indeed, Dr. Sobol noted that Plaintiff "had a history of fibromyalgia" (AR 493) but did not diagnose it himself. Although Dr. Ho treated Plaintiff for fibromyalgia in 2007 (see AR 555) and noted 12 of 18 trigger points in December 2010 (AR 557) and 14 of 18 trigger points in February 2011 (AR 561), there is no evidence that he excluded other potential sources for the pain. The opinion of physician's assistant Chan (see AR 563-68) is not relevant because it is not from an acceptable medical source and was rendered nearly two years before the disability period.

of medical evidence, conservative treatment, improvement with
treatment, and inconsistency with Plaintiff's testimony.  (AR
33.)   Indeed, although Plaintiff was diagnosed with irritable
bowel syndrome by physician's assistant Flores (AR 730-31), a
diagnosis that was confirmed by Dr. Coutin (AR 722), Plaintiff
did not mention gastroesophageal reflux disease in his hearing
testimony.  Nor has he explained how it allegedly prevents him
from working; indeed, he does work despite allegedly suffering
from it.  Further, Plaintiff acknowledged that he stopped taking
one of his irritable bowel syndrome medications because he was
"doing okay" using just another.  (AR 60; see infra Section
V(B)(2).)  And he has presented no evidence of treatment for
headaches beyond pain medication.  See Hanes, 651 F. App'x at 705
(finding that ALJ permissibly discounted treating physicians'
opinions based in part on plaintiff's hearing testimony and
conservative treatment); Warre v. Comm'r of Soc. Sec. Admin., 439
F.3d 1001, 1006 (9th Cir. 2006) ("Impairments that can be
controlled effectively with medication are not disabling for the
purpose of determining eligibility for SSI benefits."); Thomas,
278 F.3d at 957.

Thus, the ALJ did not err in assessing the medical
evidence.[19]

---

[19] Plaintiff suggests that the ALJ erred in failing to
consider the side effects of medication.  (See J. Stip. at 15.)
He does not indicate what those alleged side effects were,
however, nor does he cite to any medical-record evidence to
support the claim.  (Id.)  Indeed, in May 2010, Dr. Curtis noted
that Plaintiff had no side effects from his medications.  (AR
462.)

1            B.   <u>The ALJ Properly Assessed Plaintiff's Credibility</u>

2        Plaintiff argues that the ALJ failed to "adequately follow

3   the rules in assessing" Plaintiff's credibility.  (J. Stip. at

4   18.)  For the reasons discussed below, the ALJ did not err.

5            1.   <u>Applicable law</u>

6        An ALJ's assessment of symptom severity and claimant

7   credibility is entitled to "great weight."  <u>See</u> <u>Weetman v.</u>

8   <u>Sullivan</u>, 877 F.2d 20, 22 (9th Cir. 1989); <u>Nyman v. Heckler</u>, 779

9   F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to

10  believe every allegation of disabling pain, or else disability

11  benefits would be available for the asking, a result plainly

12  contrary to 42 U.S.C. § 423(d)(5)(A)."  <u>Molina v. Astrue</u>, 674

13  F.3d 1104, 1112 (9th Cir. 2012) (citing <u>Fair v. Bowen</u>, 885 F.2d

14  597, 603 (9th Cir. 1989)).

15       In evaluating a claimant's subjective symptom testimony, the

16  ALJ engages in a two-step analysis.  <u>See</u> <u>Lingenfelter</u>, 504 F.3d

17  at 1035-36.  "First, the ALJ must determine whether the claimant

18  has presented objective medical evidence of an underlying

19  impairment [that] could reasonably be expected to produce the

20  pain or other symptoms alleged."  <u>Id.</u> at 1036.  If such objective

21  medical evidence exists, the ALJ may not reject a claimant's

22  testimony "simply because there is no showing that the impairment

23  can reasonably produce the <u>degree</u> of symptom alleged."  <u>Smolen</u>,

24  80 F.3d at 1282 (emphasis in original).

25       If the claimant meets the first test, the ALJ may discredit

26  the claimant's subjective symptom testimony only if the ALJ makes

27  specific findings that support the conclusion.  <u>See</u> <u>Berry v.</u>

28  <u>Astrue</u>, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent a finding or

affirmative evidence of malingering, the ALJ must provide "clear
and convincing" reasons for rejecting the claimant's testimony.
Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015) (as
amended); Treichler v. Comm'r of Soc. Sec. Admin., 775 F.3d 1090,
1102 (9th Cir. 2014).  The ALJ may consider, among other factors,
(1) ordinary techniques of credibility evaluation, such as the
claimant's reputation for lying, prior inconsistent statements,
and other testimony by the claimant that appears less than
candid; (2) unexplained or inadequately explained failure to seek
treatment or to follow a prescribed course of treatment; (3) the
claimant's daily activities; (4) the claimant's work record; and
(5) testimony from physicians and third parties.  Rounds v.
Comm'r Soc. Sec. Admin., 807 F.3d 996, 1006 (9th Cir. 2015) (as
amended); Thomas, 278 F.3d at 958-59.  If the ALJ's credibility
finding is supported by substantial evidence in the record, the
reviewing court "may not engage in second-guessing."  Thomas, 278
F.3d at 959.

## 2.  Relevant background

On June 14, 2013, state-agency psychiatrist Dr. Mary Bridges
completed a psychiatric exam.  (AR 715-20.)  She noted that
Plaintiff's "increasing stressors" included the then-recent
discontinuation of his workers'-compensation payments and
concluded that "the exaggeration of symptoms for financial gain
cannot be excluded."  (AR 719.)  She found that Plaintiff would
have no limitations in social functioning, focus, attention,
concentration, persistence, and pace.  (Id.)  He could perform
simple and repetitive as well as detailed and complex tasks.
(Id.)  She noted that although Plaintiff was not under the care

of a psychiatrist, with "active psychiatric treatment" he would improve within 12 months. (Id.) His prognosis was "good."[20] (Id.) Plaintiff told Dr. Bridges that he was able to manage his own care, do household chores, run errands, shop, and cook. (AR 717.) As hobbies, he watched television, read, and walked. (Id.) He was able to manage his own money, drive a car, ride a bus, and go places by himself. (Id.)

At the July 11, 2014 hearing, Plaintiff testified that he was working at a lumber company full time as a security guard and cleaner. (AR 56.) He had difficulty sleeping and was often tired at work. (AR 57.) Plaintiff testified that he sometimes fell asleep at work and that fatigue caused him to miss — or leave after only four hours of — work four or five days every month. (AR 61.) He could stand for about 30 minutes before needing to sit down for five minutes. (AR 57.) He was able to sit for the four hours a day he worked as a security guard. (Id.) He alleged that he was still under treatment for fibromyalgia. (AR 60.) When asked by the ALJ, "Are you taking any medications for [fibromyalgia] specifically?," Plaintiff said that he was taking amitriptyline. (Id.) But he then suggested that the amitriptyline was for sleep and depression. (Id.) When asked why he had stopped taking another medicine, apparently meant to combat irritable bowel syndrome,[21] Plaintiff said it was

---

[20] The ALJ gave "little weight" to Dr. Bridges's finding of "no mental limitations," however, to give Plaintiff the "benefit of the doubt." (AR 39.)

[21] That medicine, Dicyclomine, is used to treat the symptoms of irritable bowel syndrome. See Dicyclomine, MedlinePlus, https://medlineplus.gov/druginfo/meds/a684007.html (last updated May 15, 2014).

1  because a doctor had advised him that if he was "doing okay" on

2  just the amitriptyline he should "try to avoid any other

3  medicine." (Id.)  Plaintiff alleged pain in his left shoulder,

4  legs, arms, neck, and head. (AR 65.)  His headaches were

5  sometimes so strong that he was unable to work; this happened

6  about twice a month. (Id.)  He testified that a doctor

7  recommended that he get surgery on his back, but he chose not to

8  because at the time he was separating from his wife and later he

9  had to work to pay rent. (AR 55-56.)  He also testified,

10  however, that he had health insurance to pay for it. (AR 55.)

11            3.   Analysis

12       The ALJ found Plaintiff "less than fully credible." (AR

13  36.)  The ALJ discredited some of Plaintiff's complaints, finding

14  that although his "medically determinable impairments could

15  reasonably be expected to cause some of the alleged symptoms,"

16  his "statements concerning the intensity, persistence and

17  limiting effects of [those] symptoms" were not credible to the

18  extent they were inconsistent with his RFC. (AR 37.)  The ALJ

19  "generously consider[ed]" Plaintiff's subjective complaints and

20  gave him "the benefit of the doubt" in finding that he had a

21  severe mental impairment and in determining his RFC. (AR 39.)

22  As discussed below, to the extent the ALJ rejected Plaintiff's

23  subjective complaints, the ALJ provided clear and convincing

24  reasons for doing so.

25       First, the ALJ found that Plaintiff's "activities of daily

26  living" were inconsistent with "disabling symptoms and

27  limitations." (AR 37.)  An ALJ may properly discount a

28  plaintiff's credibility when his daily activities are

inconsistent with his subjective symptom testimony.  See Molina,
674 F.3d at 1112 (ALJ may discredit claimant's testimony when
"claimant engages in daily activities inconsistent with the
alleged symptoms" (citing Lingenfelter, 504 F.3d at 1040)).
"Even where those [daily] activities suggest some difficulty
functioning, they may be grounds for discrediting the claimant's
testimony to the extent that they contradict claims of a totally
debilitating impairment."  Molina, 674 F.3d at 1113.  Indeed,
Plaintiff could manage his own care, do household chores, run
errands, shop, and cook.  (AR 717.)  As hobbies, he watched
television, read, and walked.  (Id.)  He was able to manage his
own money, drive a car, ride a bus, and go places by himself.
(Id.)  He had been able to work for the eight months preceding
the hearing as a part-time security guard and part-time cleaner,
amounting to full-time hours.  (AR 56.)  Those activities are
inconsistent with Plaintiff's allegation that he would miss up to
eight days of work a month because of his symptoms.

     Second, the ALJ found that Plaintiff's subjective symptom
testimony was inconsistent with the medical evidence in the
record.  (AR 36.)  Indeed, as discussed in detail above, the
medical evidence does not support Plaintiff's allegations of more
severe symptoms.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th
Cir. 2005) ("Although lack of medical evidence cannot form the
sole basis for discounting pain testimony, it is a factor that
the ALJ can consider in his credibility analysis."); Carmickle,
533 F.3d at 1161 ("Contradiction with the medical record is a
sufficient basis for rejecting the claimant's subjective
testimony.").  Plaintiff himself testified that he was "doing

okay" on just one medicine and therefore had stopped another (AR 60); Warre, 439 F.3d at 1006, and he declined to have surgery that was allegedly recommended for him (AR 55-56).

Third, the ALJ noted that Plaintiff received conservative treatment for his headaches (AR 33); "did not require any extended periods of hospital confinement, emergency room treatment, use of TEN unit, participation in a pain control clinic, or other extensive or significant forms of treatment" for his pain (AR 36); decided not to get the recommended surgery on his spine (id.); and denied ever seeing a psychiatrist for his alleged mental impairment (id.). Conservative treatment was a permissible reason to discredit his allegations of more severe symptoms, see Tommasetti v. Astrue, 533 F.3d 1035, 1039-40 (9th Cir. 2008), as was failure to follow a recommended course of treatment, see Lingenfelter, 504 F.3d at 1040.

Plaintiff argues that the ALJ relied on "boilerplate with no value" by finding that Plaintiff's statements "concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely credible to the extent they are inconsistent with" the RFC assessment. (J. Stip. at 16.) He also suggests that the ALJ first decided his RFC, then evaluated his credibility by comparing his subjective complaints to the RFC. (J. Stip. at 17.) Plaintiff relies on Kilbourne v. Comm'r of Soc. Sec., No. 09-6367-HA, 2011 WL 1357330 (D. Or. Apr. 11, 2011), which reversed an ALJ's credibility assessment in part because "the ALJ's reliance upon the perceived inconsistency between [plaintiff's] testimony and the RFC . . . is error." Id. at *4. In Kilbourne, however, the ALJ failed to provide any other

1  appropriate reason for discounting the plaintiff's credibility.

2  See id. Here, by contrast, the ALJ summarized and considered

3  Plaintiff's testimony and the medical evidence and provided clear

4  and convincing reasons for discounting his credibility, as

5  detailed above.  As such, Kilbourne is inapplicable and the

6  boilerplate used by the ALJ was harmless and not grounds for

7  remand.  See Treichler, 775 F.3d at 1103 ("After making this

8  boilerplate statement, the ALJs typically identify what parts of

9  the claimant's testimony were not credible and why."); Tipton v.

10 Colvin, No. 1:13-cv-00359-REB, 2014 WL 4773964, at *6 & n.5 (D.

11 Idaho Sept. 24, 2014) (finding, in case using nearly identical

12 boilerplate language, that "though the use of such common

13 boilerplate language runs the risk of 'getting things backwards,'

14 its mere use is not cause for remand if the ALJ's conclusion is

15 followed by sufficient reasoning").

16     In sum, the ALJ provided clear and convincing reasons for

17 finding Plaintiff only partially credible.  Because those

18 findings were supported by substantial evidence, this Court may

19 not engage in second-guessing.  See Thomas, 278 F.3d at 959.

20 Plaintiff is not entitled to remand on this ground.

21     C.   The ALJ Properly Assessed Plaintiff's RFC

22     Plaintiff contends that the ALJ's RFC assessment was not

23 supported by the record.  (J. Stip. at 25.)  To support his

24 argument, he simply reiterates his contentions that the ALJ erred

25 in assessing the medical evidence and in discounting his

26 subjective claims of disabling symptoms.

27     A district court must uphold an ALJ's RFC assessment when

28 the ALJ has applied the proper legal standard and substantial

evidence in the record as a whole supports the decision.  <u>Bayliss v. Barnhart</u>, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical evidence in the record and "explain in [his] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources."  § 416.927(e)(2)(ii); <u>see also</u> § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").  In determining the RFC, the ALJ may consider those limitations for which there is support in the record and need not consider properly rejected evidence or subjective complaints.  <u>See</u> <u>Bayliss</u>, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); <u>Batson</u>, 359 F.3d at 1197 (ALJ not required to incorporate into RFC those findings from treating-physician opinions that were "permissibly discounted").  If the "'evidence is susceptible to more than one rational interpretation,' the ALJ's decision should be upheld."  <u>Ryan v. Comm'r of Soc. Sec.</u>, 528 F.3d 1194, 1198 (9th Cir. 2008) (citation omitted).

As discussed above, the ALJ did not err in assessing the medical-opinion evidence or Plaintiff's credibility.  Properly rejected medical evidence and subjective complaints do not need to be incorporated into a Plaintiff's RFC.  <u>See</u> <u>Bayliss</u>, 427 F.3d at 1217.  As such, remand is not warranted on this basis.

D.   Substantial Evidence Supported the ALJ's Determination
     that Plaintiff Could Perform the Representative Light-
     Work Jobs

Plaintiff argues that the ALJ improperly relied on the VE's testimony that he could perform three light-work jobs because the "jobs as mentioned do not seem to take into consideration" Plaintiff's postural limitations and inability to work with moving machinery, and the hypothetical posed to the VE "did not encompass the extent" of Plaintiff's physical and mental impairments. (J. Stip. at 32.) For the reasons discussed below, remand is not warranted on this basis.

1.   Applicable law

Jobs are classified as "sedentary, light, medium, heavy, and very heavy" according to their "physical exertion requirements." § 416.967. "Light work" generally involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds," though "the weight lifted may be very little." § 416.967(b); see SSR 83-10, 1983 WL 31251, at *5. Light work "requires a good deal of walking or standing, or . . . involves sitting most of the time but with some pushing and pulling of arm or leg controls." § 416.967(b); see SSR 83-10, 1983 WL 31251, at *5. "To be considered capable of performing a full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." § 416.967(b).

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in "significant numbers" in the national or regional

economy, taking into account the claimant's RFC, age, education, and work experience.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); <u>see</u> 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.960(c).  The Commissioner may satisfy that burden either through the testimony of a VE or by reference to the grids.  <u>Tackett</u>, 180 F.3d at 1100-01.

The DOT "is not the sole source of admissible information concerning jobs," and the ALJ "may take administrative notice of any reliable job information, including the services of a vocational expert."  <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995) (alteration and citations omitted).  The DOT "lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings," and a VE "may be able to provide more specific information about jobs or occupations than the DOT."  SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000).  "A VE's recognized expertise provides the necessary foundation for his or her testimony," and "no additional foundation is required."  <u>Bayliss</u>, 427 F.3d at 1218.

## 2.   Relevant background

The ALJ asked the VE to consider a hypothetical "younger" individual "with a limited education, who is unable to speak fluently in English" and who would be "restricted to light work with occasional posturals," with "no climbing ladders, ropes, or scaffolds; no work at unprotected heights, around moving machinery or other hazards."  (AR 71.)  The VE testified that such a hypothetical individual could perform three jobs in the regional and national economy: housekeeping cleaner, DOT 323.687-

014, 1991 WL 672783; cafeteria attendant, DOT 311.677-010, 1991
WL 672694; and dry cleaner, DOT 589.685-038, 1991 WL 684490.  (AR
71-72.)

The ALJ presented a second hypothetical, adding to the first
that the individual must "miss approximately two days a month."
(AR 72.)  The VE testified that such an individual would be
precluded from the three representative occupations.  (Id.)  The
ALJ asked the VE if his testimony was consistent with the DOT,
and the VE responded that "it is for the most part," clarifying
that his response to the second hypothetical was based "more on
[his] expertise and knowledge."  (Id.)  When invited to examine
the VE, Plaintiff's counsel presented a third hypothetical, an
individual with the same limitations from hypothetical one but
who "would have to leave the workplace at will and take off the
rest of the day." (AR 73.)  The VE testified that such an
individual would not be able to perform the representative jobs.
(Id.)

### 3.  Analysis

Plaintiff's RFC was reduced light work with occasional
postural limitations and restrictions on working around
unprotected heights, moving machinery, and other hazards.  (AR
35.)  The ALJ properly consulted the VE to determine whether any
available jobs would adequately accommodate Plaintiff's specific
limitations.  See SSR 83-12, 1983 WL 31253, at *2 (noting that
when individual's exertional RFC does not coincide with any of
defined ranges of work but instead includes "considerably greater
restriction(s)," VE testimony can clarify extent of erosion of
occupational base); Moore, 216 F.3d at 870; Thomas, 278 F.3d at

1  960.

2      Plaintiff argues that the three identified jobs "do not seem

3  to take into consideration" his postural limitations and

4  "inability to work with moving machinery" because a housekeeping

5  cleaner "would no doubt include the use of cleaning equipment on

6  a regular basis," a dry cleaner operates "moving equipment," and

7  a cafeteria attendant "would no doubt require the use of cooking,

8  food preparation, cleaning, and maintenance equipment." (J.

9  Stip. at 31-32.)  Plaintiff's assumptions about these

10 occupations, however, are in conflict with the definitions

11 supplied by the DOT and the testimony of the VE.

12     The job of housekeeping cleaner requires only occasional

13 posturals and no work around moving machinery.  <u>See</u> DOT

14 323.687-014, 1991 WL 672783.  The job of cafeteria attendant

15 requires only occasional stooping; no climbing, balancing,

16 kneeling, crouching, or crawling; and no moving machinery.  <u>See</u>

17 DOT 311.677-010, 1991 WL 672694.  And contrary to Plaintiff's

18 assertion, the job of dry cleaner apparently does not involve

19 moving machinery (and no posturals).  <u>See</u> DOT 589.685-038, 1991

20 WL 684490.  The DOT descriptions of the three identified jobs

21 support the ALJ's conclusion that Plaintiff could perform them.

22 A person performing the job of housekeeping cleaner

23     [c]leans rooms and halls in commercial establishments,

24     such as hotels, restaurants, clubs, beauty parlors, and

25     dormitories, performing any combination of following

26     duties: Sorts, counts, folds, marks, or carries linens.

27     Makes beds.  Replenishes supplies, such as drinking

28     glasses and writing supplies.  Checks wraps and renders

36

1    personal assistance to patrons.  Moves furniture, hangs

2    drapes, and rolls carpets.

3  DOT 323.687-014, 1991 WL 672783.  A person performing the

4  cafeteria attendant job

5    [c]arries  trays  from  food  counters  to  tables  for

6    cafeteria patrons.  Carries dirty dishes to kitchen.

7    Wipes tables and seats with dampened cloth.  Sets tables

8    with clean linens, sugar bowls, and condiments.  May wrap

9    clean silver in napkins.

10  DOT 311.677-010, 1991 WL 672694.  And someone performing the dry

11  cleaner job

12    [t]ends cleaning machine and drier that clean and dry

13    knitted  garments:  Examines  garment  for  soil  and

14    determines type of soil.  Lays garment on cleaning board

15    with spotted surface exposed.  Applies soap solvent to

16    spot with brush and removes excess soap with towel.

17    Opens valve to admit cleaning fluid to tank of washing

18    machine.   Lays  spotted  garment  in  machine  and  starts

19    machine.  Stops machine after specified time, and removes

20    and places garment in drier.  Removes garment from drier

21    and hangs garment on hook in clothes room.  Turns fan on

22    in  clothes  room  to  drive  cleaning  fluid  fumes  from

23    clothes.  Removes garment from clothes room.

24  DOT 589.685-038, 1991 WL 684490.  Nothing in those job

25  descriptions appears to conflict with Plaintiff's RFC.  Even if

26  the "machine and drier" from the dry-cleaner description are

27  interpreted as "moving machinery," any error in listing the dry-

28  cleaner job was harmless because the other two jobs clearly do

not involve moving machinery.  See Stout v. Comm'r, Soc. Sec.
Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (nonprejudicial or
irrelevant mistakes are harmless); Gallo v. Comm'r of Soc. Sec.
Admin., 449 F. App'x 648, 650 (9th Cir. 2011) ("Because the ALJ
satisfied his burden at Step 5 by relying on the VE's testimony
about the Addresser job, any error that the ALJ may have
committed by relying on the testimony about the 'credit checker'
job was harmless" (citing Carmickle, 533 F.3d at 1162)).
Plaintiff also complains that the hypothetical posed by the ALJ
"did not encompass the extent of" his limitations.  (J. Stip. at
32-33.)  As discussed in detail above, however, the ALJ did not
err in assessing Plaintiff's RFC.  The ALJ specifically
discounted Plaintiff's allegations of more restrictive
limitations in sitting and standing, posturals, and likely
workplace absences.  The ALJ was not required to include in the
RFC or the VE hypothetical limitations that were permissibly
discounted.  See Batson, 359 F.3d at 1197 (ALJ not required to
incorporate into RFC those findings from treating-physician
opinions that were "permissibly discounted"); see also Yelovich
v. Colvin, 532 F. App'x 700, 702 (9th Cir. 2013) ("Because the
RFC was not defective, the hypothetical question posed to the VE
was proper.").

     Substantial evidence supported the ALJ's finding that
Plaintiff could perform at least two of the jobs identified by
the VE.  The ALJ was entitled to rely on the VE's informed,
specific, and uncontradicted explanation that consistent with his
RFC for a limited range of light work, Plaintiff was able to work
as a housekeeping cleaner, cafeteria attendant, and possibly a

dry cleaner.   See Bayliss, 427 F.3d at 1218.   Accordingly, remand is not warranted on this basis.

**VI.   CONCLUSION**

Consistent with the foregoing and under sentence four of 42 U.S.C. § 405(g),[22] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner, DENYING Plaintiff's request for remand, and DISMISSING this action with prejudice.


DATED: March 9, 2017

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[22] That sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."